**Supreme Court**

No. 2011-325-Appeal.
(05-138-01)
No. 2011-326-Appeal.
(05-138-02)

In re Isabella M. et al.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2011-325-Appeal.
(05-138-01)
No. 2011-326-Appeal.
(05-138-02)

In re Isabella M. et al.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The respondents, Cristin B. (mother) and Mark M. (father) appeal from a Family Court decree terminating their parental rights to their children, Isabella M. (Bella) and James Cody B. (Cody).  On appeal, the mother argues that the trial justice erred in finding that she had a chronic substance-abuse problem, that her conduct was seriously detrimental to the children, that Bella and Cody would not be able to safely return to her care within a reasonable period of time, and that, therefore, she is an unfit parent under G.L. 1956 § 15-7-7(a).  The father urges that the trial justice erred in determining, under the same statute, that he was unfit because the children had been in state custody for more than twelve months without a substantial probability of safe return to his care and because he had abandoned the children.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

## Facts and Procedural History

On September 16, 2010, the Department of Children, Youth and Families (DCYF) filed two petitions for the involuntary termination of respondents' parental rights with respect to Bella and Cody.  DCYF alleged the following: (1) that mother was unfit because of chronic substance

abuse that rendered her unlikely to be able to provide care for Bella and Cody within a reasonable period of time; (2) that the children had been in DCYF custody for at least twelve months and that both respondents were offered or received services but that there was not a substantial probability that the children would be able to safely return to either respondent's care within a reasonable time period; (3) that both respondents had exhibited behavior or conduct seriously detrimental to the children of such a duration as to render it improbable that either respondent would be able to care for the children for an extended time period; and (4) that father had abandoned the children.

A trial on the petitions to terminate respondents' parental rights was held before a justice of the Family Court over six days in May and June 2011. At trial, the Family Court heard testimony from two DCYF employees who had been involved in the case. The mother was present for one day of testimony and for the trial justice's bench decision. The father did not appear for any portion of the trial. Neither respondent testified at trial.

Jane Johnson, a DCYF supervisor, testified that the case was assigned to her unit in June 2008 after DCYF received a call from the Warwick Police Department reporting a physical altercation between mother and one of her sisters. At that time, DCYF filed a petition alleging neglect against mother.[1] On July 17, 2008, Johnson visited mother at her cousin's home, where she had been staying with the children. At that meeting Johnson talked to mother about enrolling in a substance-abuse and mental-health treatment program, and she scheduled a follow-up visit at which mother would sign the necessary release forms. However, when Johnson arrived for the follow-up visit, mother was not home. Ms. Johnson did, however, speak with mother on the telephone at that time about an upcoming court date and left a list of housing resources.

---

[1] Ms. Johnson also noted that, according to the case history, Bella had been placed in DCYF care for approximately seven months during 2005.

On July 28, 2008, DCYF received a call reporting that mother was residing with the children and a male friend in a basement boiler room that did not meet code standards and was going to be shut down. When Johnson followed up with mother about this report, mother explained that she had moved out of her cousin's home temporarily because there was a "threat of head lice," and she also reported that she was two months pregnant with a third child. During that conversation, mother agreed to undergo a substance-abuse evaluation. Then, on August 22, 2008, Johnson received information that mother was living in a tent in her cousin's back yard, had been arrested for simple assault, and had been sent to the Adult Correctional Institutions (ACI). As a result, DCYF removed the children and placed them in nonrelative foster care, where they have since remained.[2]

After the children were placed in foster care, mother had visitation with them but was required to call in advance to confirm visits because Bella became very upset when mother was late to or missed visits. In October 2008, Johnson met with mother to review her case plan. The goal of the case plan was reunification with the children and, per the plan, mother was to engage in mental-health treatment (including completing a psychological and parent-child evaluation), participate in a substance-abuse evaluation and follow-up services, and improve her financial stability by obtaining appropriate housing and utilizing community resources. However, mother refused to sign the case plan without an attorney present and conveyed that she was not interested in participating in substance-abuse treatment because she believed that "her only problem was housing." Finally, Johnson testified that she had a conversation with mother in July 2009 during which she advised mother to participate in housing, substance-abuse, and mental-health programs because "time was running out for her in regards to her getting the children

---

[2] Although Bella and Cody were initially placed separately, they currently reside together in a preadoptive foster home.

back." During that meeting, mother reported that she had made an appointment with CODAC Behavioral Healthcare (CODAC), but Johnson testified that mother's engagement with that organization was only "sporadic[]."

Tracey Bonang, the DCYF caseworker who was assigned to the case in September 2008, also testified at trial about mother's progress towards her case-plan goals. With respect to the mental-health treatment component of the plan, Bonang reported that mother engaged in some services at the Halo Clinic, but was inconsistent about taking prescribed medications and did not complete a psychological and parent-child evaluation. The mother also participated in two substance-abuse programs, but completed neither. She did obtain housing for a short period of time, but was evicted. Throughout this period, mother had weekly visits with the children, but was not consistent and frequently arrived late.

In April 2009, when the first case plan expired, DCYF implemented a second case plan for mother, featuring many of the same objectives (mental-health treatment, substance-abuse treatment, and housing), again, with the goal of reunification. Although mother was accepted into a reunification program through Newport Child and Family Services that included housing and a variety of other services, she was unsuccessfully discharged from that program in August 2009. Ms. Bonang testified that had mother remained successfully engaged in the program, she would have been reunified with her children and would have received ongoing housing assistance.

Additionally, mother received services from CODAC during this period and eventually completed a psychological and parent-child evaluation with Dr. Brian Hayden. Doctor Hayden's report identified a history of substance-abuse and mental-health issues and concluded that reunification was not likely unless mother "seriously address[ed] her mental health issues and

her tendency to abuse various substances." Doctor Hayden also recommended that mother submit to random urine screens and complete a substance-abuse program to address what he described as a "strategy to cope [that is] highly correlated with substance abuse which is to rely on some pleasurable activity to distract one from dealing with a stressor."

In the fall of 2009, mother successfully completed intensive inpatient substance-abuse treatment at the Kent Center. During her subsequent participation in the Kent Center's outpatient program, mother tested positive for alcohol and various psychiatric medications. Because mother was noncompliant with her appointments, she was terminated from that program in April 2010.

Also in the fall of 2009, Bonang prepared a third case plan for mother, again with tasks including obtaining mental-health and substance-abuse treatment and maintaining financial and housing stability. Ms. Bonang testified that, to her knowledge, mother never held a steady job during the period that the third case plan was in place. A fourth case plan eventually was implemented, and it featured the same basic set of tasks, as well as domestic-violence counseling; mother did not complete either those tasks or the domestic-violence counseling. The mother was hospitalized three times at Butler Hospital and, at the time of trial, was receiving some mental-health services. Ms. Bonang also noted that, at the time of trial, mother was homeless.

Ms. Bonang also testified regarding father's involvement with DCYF. Initially, there was some dispute as to Cody's paternity; but, in 2009, paternity testing established that he was, in fact, Cody's father. Because father's criminal background involved several domestic-violence arrests, his case plan required him to participate in mental-health and anger-management treatment. He successfully completed a program through Vantage Point, as well as a parent-

child evaluation. DCYF provided financial assistance to father to help him obtain appropriate housing. Ms. Bonang also referred father to the Providence Children's Museum Families Together Program, but he was twice terminated from that program. Since his second termination from that program in June 2010, father has not visited with either Bella or Cody. Ms. Bonang testified that, in September and October 2010, father was incarcerated in connection with a domestic-violence incident involving his then-girlfriend. Following father's release from the ACI, he contacted Bonang several times about resuming visitation and scheduled appointments, but "missed quite a few of those appointments." Ms. Bonang testified that "[b]ased on [father's] lack of follow-through with many appointments * * * and based on the clinical recommendations of Isabella's therapist," the children's guardian ad litem moved to suspend the children's visitation with father in February 2011.[3] Ms. Bonang also acknowledged that father had never been accused of directly harming Bella or Cody.

Ms. Bonang testified that, at the time of trial, Bella and Cody were placed together in a nonrelative, preadoptive foster home. Additionally, she noted that Bella had struggled with numerous behavioral and mental-health problems and had been in counseling for roughly two years prior to trial. In particular, Bonang testified that Bella experienced anxiety related to visits with her father and that, after visits stopped in June 2010, DCYF had to increase the frequency of her mental-health services.

---

[3] It is not clear from the case file whether the motion to suspend father's visitation was granted, but, in their filings with this Court, the parties indicate that it was.

At trial, each of the four case plans developed by DCYF for respondents was introduced into evidence as a full exhibit.[4]  Additionally, Dr. Hayden's evaluation of mother was entered as a full exhibit.

On June 23, 2011, the trial justice rendered his bench decision terminating respondents' parental rights.  The trial justice found by clear and convincing evidence that both children had been in the custody of DCYF for approximately twenty-eight months.  Additionally, he found that both respondents were offered or received services from DCYF, which "were clearly delineated in the case plans that were presented to the [c]ourt * * *."

The trial justice found that DCYF's determinations regarding mother's substance-abuse, mental-health, domestic-violence, and parenting-skills issues were "more than adequately supported by the evidence adduced at trial," and he concluded that, notwithstanding "[v]arious case plans [that] were developed by the agency and presented to the mother[,] * * * [t]hroughout her involvement with DCYF [mother] displayed on numerous occasions a lack of cooperation and a chronic disregard of her parenting obligations."  In particular, the trial justice outlined a long list of services with which mother failed to follow through and noted that "[s]ince August 2009 she has demonstrated a lack of cooperation with the DCYF social worker and failed to appear for numerous appointments to address the situation and conditions which led to the children coming into the care of the State."  Finally, he observed that mother failed to make progress toward completing any of the three primary tasks outlined in all of her case plans— obtaining mental-health treatment, substance-abuse treatment, and stable housing.  Therefore, the trial justice found "by clear and convincing evidence that the [mother] is unfit by reason of

---

[4] Although separate case plans were developed for Cody and Bella, it appears that only Cody's were introduced into evidence.  However, a review of the record indicates that Cody's and Bella's case plans were substantially similar in all material respects.

conduct or conditions seriously detrimental to these children." Additionally, he found that mother "has a chronic substance abuse problem," and he concluded that, notwithstanding DCYF's efforts to engage mother in various substance-abuse programs, her "prognosis indicates that the children will not be able to return * * * to her custody within a reasonable period of time considering these children's tender years and their need for a permanent home."

With respect to father, the trial justice found that, although he completed an anger-management course, he did not successfully complete the Families Together Program as was required by his case plan. Additionally, the trial justice noted that DCYF provided rental assistance to father when it appeared that reunification with the children might be possible. The trial justice also found, however, that father had not visited with the children since June 26, 2010 (nearly one year) and had not had "meaningful contact" with the DCYF worker for more than fourteen months. Therefore, the trial justice found by clear and convincing evidence that father "ha[d] exhibited by his conduct an utter and willful disregard for his children by abandoning and deserting them" and that, therefore, he was an unfit parent.

Additionally, the trial justice noted that the children "are both placed together in a pre-adoptive home and are doing well. The foster family has expressed to the DCYF a willingness to be a permanent family for the children." The trial justice therefore terminated both respondents' parental rights. On June 30, 2011, the trial justice entered a termination of parental rights decree outlining his findings of fact. Both respondents timely appealed.

## II

### Standard of Review

In reviewing a decision terminating parental rights, "we remain keenly mindful that natural parents have a 'fundamental liberty interest' in the care, custody, and management of

their children." In re Steven D., 23 A.3d 1138, 1154 (R.I. 2011) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Therefore, "[i]n order to permanently sever the rights of a parent in his or her children, the trial justice must make a determination that the parent is unfit" and "[t]he state must prove parental unfitness by clear and convincing evidence in order to satisfy the parent's right to due process." In re Alexis L., 972 A.2d 159, 165 (R.I. 2009). The trial justice's findings are entitled to significant weight, and we will not overturn them unless they are "clearly wrong or the trial justice misconceived or overlooked material evidence." Id. (quoting In re David L., 877 A.2d 667, 671 (R.I. 2005)). However, "[u]pon a determination of parental unfitness, the best interests of the child outweigh all other considerations." In re Dayvon G., 10 A.3d 448, 454 (R.I. 2010) (quoting In re Brook Ann R., 994 A.2d 1241, 1244 (R.I. 2010)).

## III

### Discussion

Section 15-7-7(a)[5] sets forth several specific grounds upon which the Family Court may base a termination of parental rights, and it is apparent that the trial justice relied on several of

---

[5] General Laws 1956 § 15-7-7(a) provides, in pertinent part:

> "The court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> "* * *
>
> "(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:
>
> "* * *
>
> "(iii) The child has been placed in the legal custody or care of [DCYF] and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able

these statutory provisions in reaching his conclusion in this case. In his decree, the trial justice concluded that there was a sufficient basis to terminate both respondents' parental rights under § 15-7-7(a)(3) because the children had been in DCYF custody for at least twelve months, both parents were offered and received services to rectify the situation that led to DCYF placement, and it was not substantially probable that the children would return to either parent's care within a reasonable period. Additionally, pursuant to § 15-7-7(a)(2)(iii), the trial justice found by clear and convincing evidence that mother was unfit because the children had been in DCYF custody, mother had a chronic substance-abuse problem, and mother's prognosis indicated that the children would not return to her care within a reasonable time. He also concluded, pursuant to § 15-7-7(a)(2)(vii), that mother was unfit because she had "exhibited behavior or conduct that is

---

to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;

"* * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

"(3) The child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; or

"(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

- 10 -

seriously detrimental to the child[ren], for a duration as to render it improbable for [her] to care for the child[ren] for an extended period of time." Finally, the trial justice found, under § 15-7-7(a)(4), that father had deserted or abandoned the children. The respondents take issue with each of these conclusions. We shall address the arguments of each respondent separately.

**A**

**Mother**

On appeal, mother disputes several of the Family Court's factual findings underpinning each of its three grounds for terminating her parental rights. We begin by addressing her argument that the trial justice erroneously terminated her parental rights pursuant to § 15-7-7(a)(3), which provides that a parent may be found unfit if

> "[t]he child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and need for a permanent home[.]"

The mother contends that the trial justice misconceived and overlooked material evidence in finding that the children's return to her home within a reasonable period was improbable and was clearly wrong in reaching that conclusion. In particular, mother objects to the trial justice's findings regarding her consistent failure to follow through on mental-health and substance-abuse treatment, her unsuccessful discharges from substance-abuse treatment programs, and her absence from or tardiness to appointments with her DCYF caseworker and visits with her children. She notes that she did eventually complete a psychological evaluation with Dr. Hayden and successfully engaged in some mental-health and substance-abuse treatment. Additionally,

she contends that, although she missed one early meeting with her caseworker and was sometimes late to visits, she did not miss visits with her children.

In response, DCYF points out that the trial justice specifically found that mother "displayed on numerous occasions a lack of cooperation and a chronic disregard of her parenting obligations" and points to several substance-abuse, mental-health, and housing programs that mother failed to successfully complete. The guardian ad litem adds that DCYF made a number of referrals to various service agencies to assist mother with her mental-health, substance-abuse, and housing issues, but that she has been persistently unwilling to cooperate with services.

Although mother offers various excuses and justifications for specific shortcomings and failures, we are of the opinion that, when taken as a whole, the record reveals that mother made little progress toward completing the tasks and goals outlined in the four case plans developed for her by DCYF; and, accordingly, we do not conclude that the trial justice overlooked or misconceived material evidence or that he was clearly wrong in making his findings. In particular, we observe that the uncontroverted testimony of two DCYF workers demonstrates that, although mother occasionally and sporadically engaged in select services, she generally failed to follow through with the majority of the services to which she was referred. Additionally, Tracey Bonang testified that mother had been homeless for most of the two-and-a-half-year period preceding trial. Under these circumstances, we will not disturb the finding of the trial justice that there was no "substantial probability that the child[ren] will be able to return safely to the [mother's] care within a reasonable period of time considering [their] age and the need for a permanent home." Section 15-7-7(a)(3).

The mother also takes issue with the trial justice's findings that she was unfit under § 15-7-7(a)(2)(iii) and (a)(2)(vii). However, because we have already concluded that the trial justice

did not err in finding mother unfit pursuant to § 15-7-7(a)(3), we need not address these additional grounds for termination of her parental rights.

## B

## Father

Next, we turn to father's claims of error concerning the Family Court's findings. He argues that the trial justice erred both in terminating his parental rights after finding that there was no substantial likelihood that the children would return to his care within a reasonable time period and that he had abandoned or deserted the children.

We address father's second argument first. Section 15-7-7(a)(4) provides that a court shall terminate parental rights upon a finding by clear and convincing evidence that "[t]he parent has abandoned or deserted the child," and it further specifies that "[a] lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion." The trial justice specifically found, based on Bonang's uncontroverted testimony, that father had not visited with his children for nearly one year prior to trial. The father acknowledges that the presumptive six-month period for abandonment was established in this case, but he argues that he continued to make efforts to maintain contact and was "[l]egally [p]revented" from doing so when his visitation rights were suspended. In particular, father avers that the trial justice overlooked the fact "that [he] contacted the worker in the late fall of 2010, following his release from jail, and again in the spring of 2011, even after his visitation was suspended." He also points out that we have previously held that a parent's good-faith efforts to visit with his or her children may overcome the statutory presumption of abandonment after six months of no contact, and he urges that we apply that case law here. See In re Angelina T., 996 A.2d 623, 627 (R.I. 2010) (concluding that when a father's repeated

- 13 -

attempts to establish visitation with his daughter were denied by the Family Court, he had not abandoned his daughter even though the six-month statutory period of no contact was met).

DCYF and the guardian ad litem respond that father's visitation rights were not suspended until well after the six-month period had lapsed, and they maintain that father failed to rebut the statutory presumption of abandonment. DCYF further asserts that there is no legal basis for father's argument that the court erred in finding abandonment because he was "legally prevented" from contacting his children, and it notes that this Court has upheld the finding of abandonment even where there was not a complete lack of contact for the requisite period. See In re Danesha J., 889 A.2d 230, 231 (R.I. 2006) (mem.) ("The lack of visits or contact need not be total; rather, as this Court has held, the parent has an affirmative obligation to maintain substantial and repeated contact with the child, and he or she must demonstrate consistent interest in or concern for the child.").

Here, the uncontroverted testimony at trial demonstrates that, following his visit with the children in June 2010, the father had no additional contact with his children and that, despite some attempts to meet with the DCYF caseworker in late 2010 and early 2011, he missed or canceled several appointments, and visitation never actually resumed. The facts presented here are markedly different from those in In re Angelina T., 996 A.2d at 627, because there the father filed various motions with the Family Court seeking to establish visitation and completed several programs upon the request of DCYF in an effort to establish a relationship with his daughter. By contrast, here contact between the father and his children ceased completely after he was terminated from the Families Together Program in June 2010, and the uncontroverted testimony of the DCYF worker indicates that he did not resume contact with DCYF until late in 2010 or early in 2011, and, even then, missed or canceled his appointments with her. We therefore

conclude that the trial justice did not err in finding, pursuant to § 15-7-7(a)(4), that the father had abandoned his children. Finally, because we conclude that the trial justice properly found abandonment in this case, we need not address the father's argument regarding termination of his parental rights under § 15-7-7(a)(2)(vii).

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the decree of the Family Court terminating the respondents' parental rights. The record shall be remanded to the Family Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** In re Isabella M. et al.

**CASE NO:** No. 2011-325-Appeal.
(05-138-01)
No. 2011-326-Appeal.
(05-138-02)

**COURT:** Supreme Court

**DATE OPINION FILED:** May 28, 2013

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Raymond E. Shawcross

**ATTORNEYS ON APPEAL:**

For DCYF: Karen A. Clark
Department of Children, Youth & Families

For CASA: Shella R. Katz
Court Appointed Special Advocate

For Respondent-Mother:
Catherine Gibran
Office of the Public Defender

For Respondent-Father:
Katherine C. Essington, Esq.