**Supreme Court**

No. 2014-113-Appeal.
(04-1450-2)
(04-1450-3)

In re Jake G. et al.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-113-Appeal.
(04-1450-2)
(04-1450-3)

In re Jake G. et al.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The respondent, Donald Greenslit, appeals from a decree entered in Family Court terminating his parental rights to his children, Jake and Lily. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

## Facts and Travel[1]

The incident leading to the termination of respondent's parental rights is disturbing and gruesome. On January 22, 2012, respondent stabbed Stacie Dorego, the mother of two of his children, while in their home. After she died, he brutally dismembered her body and began burning her remains in a fireplace located in the basement of their house. The two children were present in the house throughout the entirety of the incident. The respondent relayed these facts

---

[1] We relate the facts as found by the trial justice in her bench decision and as set forth in the Family Court record.

- 1 -

to members of the Johnston Police Department, claiming that he had stabbed Dorego in self-defense.

In March 2013, respondent was convicted by a jury of first-degree murder (count 1), failure to report a death (count 2), obstructing a police officer (count 3), and violation of a no-contact order (count 4).[2] The respondent was sentenced to life in prison for the first-degree murder conviction, five years on count 2, one year on count 3, and one year on count 4. All sentences are to be served consecutively.

On January 25, 2012, the Department of Children, Youth and Families (DCYF) filed petitions in Family Court alleging that respondent had abused and neglected his son Jake, who was then five years old, and his daughter Lily, who was then three years old. On June 29, 2012, DCYF filed petitions in Family Court seeking to terminate respondent's parental rights to both Jake and Lily (TPR petitions). In wording substantially similar to G.L. 1956 § 15-7-7(a)(2)(i), (ii), and (vii), the TPR petitions alleged that:

> "1. The father is unfit by reason of conduct or conditions seriously detrimental to the child, such as institutionalization of the father, including imprisonment, of such duration as to render it improbable for the father to care for the child for an extended period of time.
> "2. The father is unfit by reason of conduct or conditions seriously detrimental to the child in that the father has committed or allowed to be committed, conduct toward any child of a cruel or abusive nature.
> "3. The father has exhibited behavior or conduct that is seriously detrimental to the child, of such a duration as to render it improbable for the father to care for the child for an extended period of time."

The Family Court trial justice consolidated the neglect and termination petitions for trial, which was held on September 25, 2013. The trial justice heard testimony from four witnesses and

---

[2] The respondent's appeal from the judgment of conviction, No. 2013-290-C.A., is currently pending before this Court.

considered five sets of exhibits, including medical records from Hasbro Children's Hospital concerning the children's treatment beginning January 22, 2012, respondent's Superior Court criminal case action sheets,[3] the Johnston Police Department's records from the January 2012 incident, and the Family Service of Rhode Island records concerning the children's psychological treatment during the year and a half after their mother's murder.

Sergeant Joseph Salvadore, one of the members of the Johnston Police Department who had responded to respondent's home on January 22, 2012, was the first witness to testify at trial. He testified that, when he arrived, he saw respondent in front of the residence and observed respondent "yelling, swearing" and being "very confrontational physically with his body." Sergeant Salvadore further testified that, from prior dispatches to this residence for domestic disturbances, he knew that two children and a woman resided at this address along with respondent. He also stated that he observed the children "being taken out of the residence by fire personnel" and then he followed the rescue to Hasbro Children's Hospital. At the hospital, Sgt. Salvadore spoke with each child separately and testified that both were wearing oxygen masks. Sergeant Salvadore also testified that Jake had told him that he had smelled smoke in the house and that Lily had told him that she saw "black stuff" and coughed.

Helder Ramos, a child protective investigator with DCYF, testified next. Ramos had been assigned to investigate a call that DCYF received from Hasbro Children's Hospital. Ramos testified that "Jake reported the house was full of smoke, his father was outside, and that the mother was at the beach." Ramos also testified that he had visited respondent at the Adult Correctional Institutions' (ACI) "Intake Department" and that respondent had admitted that Jake

---

[3] The attorney for DCYF presented the trial justice with a certified copy of the criminal case action/warrant for commitment sheet in lieu of the judgment of conviction form because the attorney was not able to locate the Superior Court's file for respondent's criminal prosecution on the charges that stemmed from the events of January 22, 2012.

might have seen his mother dead on the floor. Ramos also stated that respondent had admitted to leaving the children alone for about fifteen minutes, but that respondent would not disclose where he had gone. Ramos indicated the case for both neglect and abuse.

Cheryl Dill, a marriage and family therapist with Family Service of Rhode Island, was qualified to testify as an expert in trauma-based therapy. Dill worked with Jake and Lily from March 2012 until May 2013. Dill testified that, when she began working with the children, Jake was "developmentally delayed in many areas - - speech, activities of daily living. * * * He had no social skills. He didn't understand basic boundaries, would get in people's space, touch them inappropriately, go up to kids on the playground and get in their space, climb on the laps of kids in school * * *." Dill further testified that Jake exhibited symptoms of post-traumatic stress disorder (PTSD), including nightmares, flat affect, and "a lot of talk about death." As to Lily, Dill testified that her physical neglect was "extreme. She was very, very weak, couldn't climb stairs, very underweight, very difficult to understand her, her speech. * * * Emotionally she too was showing some signs of attachment disorder, and * * * again, boundary issues, climbing into anybody's lap, running up and hugging anybody." Dill further testified that Lily's PTSD symptoms included not going to sleep, screaming from bed, and deliberately wetting her pants during the day.

Jake and Lily were placed with their maternal aunt, and lived with their two cousins and their foster father. Dill testified that both children "wanted very much to immediately integrate with their new foster family." Dill further testified that, after three to four months of therapy, it was "clinically striking" that both children did not "talk more about missing their mother, and it surprised [her] that they didn't talk more about wanting to go home. They very much just wanted to be in the present. They were angry with their father." Dill also relayed that Jake and

Lily referred to their foster parents as mom and dad within three days of living with them, and they referred to respondent as "bad dad." After approximately fifteen months of living with their foster family, Dill testified that "[t]he kids were thriving in the home environment, very comfortable there, sleeping well, eating well, had gained activities of daily living skills, were not afraid anymore of most of the things they'd been afraid of before, were no longer talking about the trauma incident or constant talk of death and dying." Dill opined that the children "would be best off staying in their current placement. It's been a stable placement, and they seem to be very comfortable there and feel like part of the family now. * * * [I]t would be harmful to them to be moved out of that placement."

Bethany Gregor, a social caseworker with DCYF, testified about the variety of both home-based and community services that had been provided to the children. Gregor testified that, based on her personal observations of the children in their foster home, the relationship between the children, their aunt, and their foster father was "very close" and "very bonded."[4]

On November 26, 2013, the trial justice held a permanency hearing, at which respondent testified. The respondent stated that he had not received "proper representation" and that he had "filed suit against [his attorney] th[at] week in [f]ederal [c]ourt." The respondent testified that he had been the primary caregiver for the children since their respective births because their mother had not become "attached," that he had done the dishes, all the baths, and cooked all of the meals. The respondent further testified that he could not work because the children's mother had

---

[4] Gregor also testified that, in June 2012, DCYF had evaluated respondent's adult daughter, Christine (Jake and Lily's half-sister), for potential placement of the children with her. Gregor further testified that Christine, who lived in Florida, had expressed an interest and willingness to have the children live with her; but, according to Gregor, placement was not approved because Christine's home only had one bedroom. Gregor acknowledged that Christine had not contacted her again and that no other member of respondent's family had contacted DCYF regarding placement of the children.

been unable to care for them, but that he had an annuity fund as a result of being a union carpenter. At respondent's request, his attorney represented to the court that respondent's mother and brother were willing and able to take Jake and Lily. The attorney for DCYF stated, however, that while respondent's mother and brother had been helpful to the children's DCYF social caseworker, neither had expressed a willingness to explore placement of the children with them.

On February 25, 2014, the trial justice rendered a detailed bench decision granting DCYF's petitions. Before she read her decision, she noted that the Family Court had been advised that respondent's attorney, who had represented him during the trial, would not be able to appear for the bench decision because he was at a hearing in Superior Court; she added that he had indicated his intent to file a motion to withdraw because respondent had filed a disciplinary complaint against him as well as a lawsuit against him in federal court.[5] The trial justice asked another attorney "to sit in and to take notes on behalf of the respondent and to consult with the respondent if necessary regarding the decision." Substitute counsel entered his appearance on behalf of respondent. The trial justice also stated that "the [c]ourt, of course, will grant you a lot of leeway in terms of any suggestions or motions that you might want to make when the decision has ended today or in the very near future * * *."[6]

---

[5] On March 3, 2014, respondent's attorney did in fact file a motion in the Family Court to withdraw as counsel due to a conflict between him and his client. The respondent's attorney attached a copy of the disciplinary complaint form to his motion; the form had been filed with this Court on February 6, 2014. The trial justice granted this motion on March 17, 2014. During oral argument before us, respondent's appellate counsel represented to us that respondent had not actually filed a lawsuit against his attorney.

[6] After the trial justice completed her bench decision, she reiterated that substitute counsel could put any additions or amendments on the record, but that she would have to schedule another date because it was so late in the afternoon that respondent had to be taken back to the ACI.

In her decision, the trial justice summarized the testimony provided by the witnesses and the contents of the exhibits filed by the state. The trial justice stated that she found each of the four witnesses to be truthful and credible, and she made twenty-two formal findings of fact regarding respondent's actions on January 22, 2012, and the consequences that emanated therefrom. Based on these findings of fact, she found that "respondent ha[d] indeed abused and neglected Lily and Jake [G.];" and she ordered that "Lily and Jake are now committed to the care, custody, and control of DCYF."

The trial justice also found "that [respondent] ha[d] been in jail since January of 2012 and there [we]re no other viable members of * * * respondent's family who could have the placement of the two children." The trial justice found "by clear and convincing evidence that the children's lives ha[d] been enriched by placement with their aunt" and described the progress that Jake and Lily had made socially and educationally. The trial justice also found "that DCYF ha[d] proven by clear and convincing evidence that the respondent [wa]s unfit as a parent," and the trial justice described the facts on which she relied to find that DCYF had proven each of the three bases that DCYF had set forth in the TPR petitions. The trial justice also found as a fact that "it is in the children's best interests to know that they can enjoy a permanent home with their loving aunt and her family."

Ultimately, the trial justice terminated respondent's parental rights to Jake and Lily in accordance with § 15-7-7(a)(2). The respondent filed a notice of appeal on March 17, 2014.[7] The decree terminating respondent's parental rights to the children was entered on April 9, 2014.

---

[7] Although respondent filed a notice of appeal before the decree had entered, we treat his notice of appeal as valid. See State v. Wray, 38 A.3d 1102, 1107 n.15 (R.I. 2012); State v. Chase, 9 A.3d 1248, 1252 n.2 (R.I. 2010).

- 7 -

## Standard of Review

When we are presented with an appeal from a decree terminating parental rights, "we remain keenly mindful that natural parents have a fundamental liberty interest in the care, custody, and management of their children." In re Jah-nell B., 116 A.3d 784, 791 (R.I. 2015) (quoting In re Isabella M., 66 A.3d 825, 830 (R.I. 2013)). This Court reviews the record to determine whether legal and competent evidence lends support to the trial justice's ruling. Id. "In conducting this review, 'a trial justice's findings are entitled to great weight and will not be overturned unless we determine that they are clearly wrong or the trial justice overlooked or misconceived material evidence.'" Id. (quoting In re Evelyn C., 68 A.3d 70, 77 (R.I. 2013)). "[I]n order to permanently sever the rights of a parent in his or her children, the trial justice must make a determination that the parent is unfit and [t]he state must prove parental unfitness by clear and convincing evidence in order to satisfy the parent's right to due process." Id. (quoting In re Isabella M., 66 A.3d at 830). "However, 'upon a determination of parental unfitness, the best interests of the child outweigh all other considerations.'" Id. (quoting In re Isabella M., 66 A.3d at 830).

## III

## Discussion

## A

## Appointment of Substitute Counsel

The respondent asserts that his "due process rights were trampled on" by the trial justice when she rendered her findings of fact and decision immediately after she had appointed substitute counsel "as a friend of the [c]ourt * * * to sit in and to take notes on behalf of the

respondent and to consult with the respondent if necessary regarding the decision." The respondent contends that the trial justice should have continued the hearing to allow the newly appointed substitute counsel sufficient time to review the record and exhibits and meet with respondent. The guardian ad litem (GAL) contends that this issue has not been properly preserved because there is no indication on the record that either respondent, his trial attorney, or substitute counsel objected to the decision being rendered as scheduled on February 25, 2014. Nonetheless, the GAL addresses this issue by arguing that, even with a timely objection before the trial justice, any error would have been harmless because the trial justice advised substitute counsel that he would be granted "a lot of leeway" and asked him to pay close attention to what she said because he would have an opportunity to suggest corrections or additions. For its part, DCYF argues that the trial justice did not have an obligation to render her decision from the bench with respondent present as she could have issued a written decision instead. DCYF also argues that there are no specific due process rights associated with the manner in which a trial justice renders a decision on a TPR petition.

After carefully reviewing the record, we discern no error in the manner in which the trial justice proceeded to render her decision. Assuming without deciding that the issue has been properly preserved, we fail to see any due process rights that have been implicated. The trial justice in this case was not obligated to render her decision from the bench; she could have simply chosen to file a written decision. Thus her reading of the lengthy decision, comprising over seventy-two transcript pages, was essentially a formality.

Contrary to respondent's contentions on appeal, the record discloses that the trial justice was being very solicitous of his rights. While "'[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is * * * a commanding one,'" we have

previously held that "there is no mandate to appoint substitute counsel after a respondent has discharged an appointed counsel." In re Bryce T., 764 A.2d 718, 721 (R.I. 2001) (quoting Lassiter v. Department of Social Services of Durham County, North Carolina, 452 U.S. 18, 27 (1981)). Rule 18(c) of the Family Court Rules of Juvenile Proceedings provides that "[a] preliminary hearing shall be held on [a petition for involuntary termination of parental rights] for the court to * * * (4) Appoint an attorney to represent the parent(s) and any person having such care or custody of such child when said parent(s) or custodian [is] unable to afford such representation[.]" There is no dispute that counsel was appointed to represent respondent at the trial on DCYF's petitions. Rule 18(c), however, does not provide a right to substitute counsel in the event that a parent discharges the counsel assigned to them. See In re Bryce T., 764 A.2d at 721.

Although respondent's trial attorney had not yet withdrawn as counsel before the trial justice rendered her decision, respondent had effectively discharged him when respondent filed a disciplinary complaint against him. The trial justice had been advised that respondent's attorney intended to file a motion to withdraw and commented that "it [was] very clear that there [wa]s now a conflict between [respondent's attorney] and [respondent]." Even though respondent was not entitled to substitute counsel, the trial justice asked another attorney to enter his appearance and to represent respondent while she rendered her decision from the bench.[8] She explicitly stated that substitute counsel would be granted "a lot of leeway in terms of any suggestions or motions that [he] might want to make when the decision has ended today or in the very near future * * *." The trial justice did not, therefore, infringe respondent's due process rights when she proceeded to render her decision to terminate his parental rights without the presence of his

---

[8] We note that the attorney in question is an experienced attorney and well-known to the Family Court.

trial attorney. Furthermore, respondent has not demonstrated that he was prejudiced in any way by either said attorney's absence during the bench decision or by substitute counsel entering his appearance immediately prior to it. Significantly, the decree terminating respondent's parental rights was not entered until April 9, 2014, affording both respondent and substitute counsel ample opportunity to raise any objections or suggest corrections to the trial justice's findings of fact.

## B

## Finding of Parental Unfitness

The respondent also asserts that the trial justice erred by finding that DCYF had proved by clear and convincing evidence that he was unfit to parent his two minor children. As DCYF and the GAL counter, however, the respondent did not indicate any specific error in the trial justice's finding of unfitness and he did not support his position with either facts or law. This Court generally "consider[s] an issue to be waived when a party '[s]imply stat[es] an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues * * *.'" Bucci v. Hurd Buick Pontiac GMC Truck, LLC, 85 A.3d 1160, 1170 (R.I. 2014) (quoting State v. Chase, 9 A.3d 1248, 1256 (R.I. 2010)). Since the respondent has not provided any discussion regarding why or how DCYF failed to prove that he was an unfit parent, this issue is not properly before us for review. Nevertheless, there is no indication that the trial justice overlooked or misconceived material evidence or that she was clearly wrong when she found that the respondent was an unfit parent. The trial justice's finding was supported by a detailed review of the evidence before her, and she made specific findings of fact on which she explicitly based her decision.

## IV

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights.  The record of this case shall be returned to the Family Court.


**TITLE OF CASE:**      In re Jake G. et al.

**CASE NOS:**      No. 2014-113-Appeal.
(04-1450-2)
(04-1450-3)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   November 16, 2015

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Providence County Family Court

**JUDGE FROM LOWER COURT**:

Chief Judge Haiganush R. Bedrosian

**ATTORNEYS ON APPEAL:**

For Petitioner:  Karen A. Clark
Department of Children Youth and Families

Lynn M. Radiches
Court Appointed Special Advocate

For Respondent:  Christopher S. Gontarz, Esq.