August 28, 2024

| In re B.M. | : | No. 2022-142-Appeal.<br>(P 18-4948) |
| In re A.M. | : | No. 2022-143-Appeal.<br>(P 18-1856) |
| In re N.M. | : | No. 2022-144-Appeal.<br>(P 18-1855) |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| In re B.M. | : | No. 2022-142-Appeal. |
| | | (P 18-4948) |
| | | |
| In re A.M. | : | No. 2022-143-Appeal. |
| | | (P 18-1856) |
| | | |
| In re N.M. | : | No. 2022-144-Appeal. |
| | | (P 18-1855) |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.** The respondent father, Michael M. (father or respondent),[1] appeals from a decree of the Family Court, issued pursuant to G.L. 1956 § 15-7-7(a)(3), that terminated his parental rights to his three sons: B.M., A.M., and N.M. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## Facts and Procedural History

On March 23, 2018, the Department of Children, Youth, and Families (DCYF) filed a petition in Family Court to terminate the parental rights of respondent and the biological mother, Marina M., to N.M. and A.M. based on one

---

[1] To protect the identities of the children, this opinion uses the respondent father's first name and last initial only. We intend no disrespect.

- 1 -

ground of unfitness: that the children had been placed in the care of DCYF for at least twelve months without a substantial probability that they could return to respondent or Marina M. within a reasonable period of time.[2] On October 5, 2018, DCYF filed a petition in Family Court to terminate the parental rights of respondent and the biological mother, Mariah T., to B.M. based on two independent grounds of unfitness: (1) that the child had been placed in the care of DCYF for at least twelve months without a substantial probability that he could return to respondent or Mariah T. within a reasonable period of time; and (2) that the parents had abandoned or deserted the child.[3]

The chief judge of the Family Court held a bench trial on DCYF's termination petitions over the course of seven days between July 24, 2020, and September 10, 2021, during which he admitted twenty-two exhibits and heard testimony from respondent; the DCYF caseworkers assigned to work with the family; John Parsons, Ph.D., who conducted respondent's psychological and parent-child evaluation; Cheryl Raposa, N.M. and A.M.'s in-home clinical therapist; Amanda Duarte-Azevedo, respondent's case manager at Community Care Alliance (CCA); Wesley Cruz, a caseworker at Northern Rhode Island Visitation Center

---

[2] A.M. and N.M.'s mother, Marina M., consented to a voluntary termination of her parental rights on November 5, 2018.

[3] The Family Court defaulted B.M.'s mother, Mariah T., on February 25, 2019, and entered a decree terminating her parental rights on March 11, 2019.

(NRIVC), a visitation program affiliated with CCA; Kelli Li, a program manager at NRIVC; and N.M. and A.M. in the form of *in camera* interviews. A summary of the testimony and documentary evidence before the Family Court follows.

Marina M. gave birth to N.M. and A.M. on July 31, 2008, and September 10, 2009, respectively. They lived with respondent and their mother until the two separated in 2014 and respondent subsequently assumed primary childcare responsibilities. On March 13, 2015, DCYF filed a dependency and neglect petition in Family Court and removed N.M. from the custody of both parents after N.M. alleged that respondent physically abused him; DCYF placed N.M. in shelter care before ultimately placing him in a nonrelative foster home. Additionally, based on N.M.'s allegations, DCYF also filed a neglect petition as to A.M. in March 2015 but later dismissed the petition after determining that A.M. could safely remain in respondent's home.

DCYF developed several case plans in an effort to facilitate reunification. The initial case plans identified as requirements for reunification compliance with a visitation plan as well as mental health counseling, anger management counseling, random drug screens, domestic violence counseling, and completion of a parent-child evaluation. The subsequent case plans reflected the same requirements for reunification, although DCYF made some verbal modifications to visitation

arrangements, such as a shift to virtual visits and phone calls with N.M. when respondent moved out of state in May 2015.

DCYF referred respondent to CCA for mental health and substance use services and NRIVC for visitation supervision upon completion of the parent-child evaluation.

The respondent left Rhode Island in May 2015, with the court's permission, when he moved with A.M. to South Carolina for a work opportunity. While in South Carolina, DCYF provided respondent with phone-call visits with N.M. and in-person visits whenever he returned to Rhode Island to attend court, provided he confirmed his attendance with DCYF at least one week prior. The respondent initiated phone contact with N.M. while out of state, and he visited in person with N.M. once between May 2015 and November 2015.

The respondent requested that DCYF facilitate an interstate transfer of N.M. to South Carolina through the Interstate Compact on the Placement of Children.[4] However, N.M.'s first DCYF caseworker could not process the transfer request because N.M.'s initial placement changes—namely, his move from shelter care to a

---

[4] General Laws 1956 § 40-15-6 of the Interstate Compact on the Placement of Children provides, in pertinent part, that "[t]he officers and agencies of this state and its subdivisions having authority to place children are hereby empowered to enter agreements with appropriate officers or agencies of or in other party states pursuant to paragraph (b) of article V of the Interstate Compact on the Placement of Children."

nonrelative foster home—delayed DCYF's ability to initiate evaluations and services, which were required for South Carolina, as the receiving state, to investigate an appropriate placement.

The respondent and A.M. relocated to Rhode Island in May 2016, initially residing at respondent's mother's home. In July 2016 respondent moved in with his partner, Mariah T., while A.M. remained with respondent's mother. Due to respondent leaving A.M. to live with respondent's mother and failing to address A.M.'s medical and behavioral needs, DCYF filed a new petition in August 2016 alleging that A.M. was dependent, abused, and neglected. DCYF removed A.M. from respondent's mother's care and placed him in the same nonrelative foster home as N.M.

Between December 1, 2016, and January 20, 2017, respondent participated in a parent-child evaluation. He engaged in multiple meetings with Dr. Parsons, during which he underwent a comprehensive psychological evaluation and completed an interactive session with the two boys. At the parent-child evaluation, Dr. Parsons observed appropriate affection and evidence of a positive emotional bond between respondent, N.M., and A.M. His diagnostic impressions of respondent included the following: disruption of family by separation or divorce; past history of physical abuse during childhood; child neglect; child abuse; unspecified depressive disorder; and personality disorder with self-defeating features. Based on his observations and

a review of respondent's family history with DCYF, Dr. Parsons concluded that N.M. and A.M. were at moderate to serious risk if reunified with respondent. Ultimately, Dr. Parsons recommended that respondent participate in a substance-abuse evaluation, individual psychotherapy with cognitive/behavioral approach, active monitoring of his psychotropic medication, anger management classes, and parenting classes, and that he seek part-time employment opportunities.

On May 3, 2017, Mariah T. gave birth to respondent's third son, B.M., who lived with respondent and Mariah T. for two days before DCYF filed a petition alleging neglect and removed him to the nonrelative foster home where his brothers resided.

The respondent initially engaged with services at NRIVC and some services at CCA, but he did not complete or consistently engage with his required obligations. Although he testified at trial that he engaged in counseling while living in South Carolina, he could not recall any specifics and conceded that he did not complete the counseling requirement while living in South Carolina. The respondent complied with toxicology screens and with some counseling sessions at CCA; however, CCA records reflect that, starting in October 2016, he attended counseling inconsistently due to frequent job changes and his unstable living situation. The respondent ultimately admitted that he stopped participating in counseling because he "didn't feel like [he] had a mental health problem."

While in counseling with Ms. Duarte-Azevedo of CCA, respondent reported that he asked DCYF to incorporate family counseling into his case plan to improve his chances of reunifying with his sons. Ms. Raposa, the boys' therapist, also recommended family counseling, although she did not make a formal referral for it. The record indicates that DCYF did not pursue family counseling.

Regarding respondent's visitation, Mr. Cruz of NRIVC testified about the consistency of visits and the lack of safety concerns between November 2016 and August 2017. The respondent remained fully cooperative and compliant with visitation between November 2016 and June 2017 until an anonymous hotline call made to DCYF disrupted the visitation schedule. Specifically, on June 13, 2017, an anonymous individual called the RI CHILD hotline to report that respondent, who had a scheduled visit with his sons later that day, possessed weapons in his vehicle and made threats to use those weapons to regain custody of his children. As a result, DCYF canceled the visit scheduled for that day, but visitation resumed one week later.

The RI CHILD hotline received a second anonymous call regarding respondent approximately one month later; the caller reported that respondent had a knife in his possession and planned to kidnap his children during their scheduled visit on July 12, 2017. DCYF canceled the visit scheduled for that day and filed a

motion in Family Court to change the visitation venue. A third hotline call made to RI CHILD resulted in DCYF canceling a visit scheduled for August 30, 2017.

Thereafter, in late 2017, NRIVC program manager Kelli Li began supervising visitation in place of Mr. Cruz. Subsequently, based on the safety concerns that arose after the three hotline calls, DCYF informed Ms. Li that it would co-supervise visits with NRIVC. However, NRIVC policy disallowed co-supervision; Ms. Li informed DCYF that the change in supervision would require NRIVC to withdraw from involvement with respondent and his family. NRIVC therefore ceased its involvement with the family.

DCYF did not provide visitation from September 2017 to January 2018. DCYF caseworker Jaimee Clerc testified that she believed that a court order required DCYF to pause visits until the court resolved the motion regarding visitation venue. However, she could not provide evidence of such an order. The court subsequently heard DCYF's motion and ordered virtual visitation via Skype between respondent and his children. Although respondent engaged with virtual visitation, Ms. Clerc testified that she noticed the boys becoming increasingly agitated and upset about having to call their father. The court reinstated in-person visitation in April 2018, but DCYF caseworkers testified that respondent did not prepare for or attend these

visits consistently.[5]  The court conditionally modified visitation from biweekly to monthly with the directive that respondent must reengage consistently and confirm his attendance with DCYF two hours prior to visits.  The respondent attended a visit on June 22, 2018; however only B.M. attended.  DCYF caseworker Donna Crawshaw attempted to contact respondent in August 2018 regarding visitation, but respondent did not answer or return the call.  In response to respondent's continued failure to reengage with visitation consistently, DCYF filed a motion in Family Court to suspend visitation; the court heard the motion on September 7, 2018, and respondent did not attend.  The court subsequently decided to make visitation subject to the clinical recommendation of Ms. Raposa,[6] but Ms. Raposa never recommended that visitation recommence.  The respondent moved to Maine in October 2018 and the record reflects that he had two in-person visits with his children thereafter: one visit with A.M. in August 2020 and one visit with B.M. in February 2021.[7]

Despite the safety concerns that arose from the hotline calls, Ms. Li testified that the visits she observed went well and that respondent appropriately engaged

---

[5] Specifically, respondent arrived with no supplies or food for the children at the visit on April 17, 2018, and failed to appear for visitation on July 6, 2018, July 20, 2018, August 3, 2018, and August 17, 2018.

[6] According to Ms. Crawshaw, the court did not issue an order containing this directive, but rather made notation of it on a back sheet.

[7] The record indicates that respondent attended one visit with A.M. in August 2020 at the request of A.M.  The respondent testified that he requested the visit with B.M. in February 2021.

with the boys. Ms. Clerc, who observed respondent's phone calls with his sons in 2018, testified that the boys began refusing to refer to respondent as father.

During his *in camera* interview, N.M. expressed unequivocally to the court that he loved his foster mother, Ms. Joanne Pettigrew, and that respondent "[is] dead to me." N.M. expressed that if he and his brothers lived with respondent, he would not feel safe. A.M. endorsed similar sentiments: He stated that he wanted no communication with respondent and expressed concern about B.M. experiencing the same abuse that he and N.M. had suffered.

Regarding the boys' foster-home placement, Ms. Crawshaw observed that the boys were happy and comfortable, and bonded well as a family with their foster mother. DCYF offered as evidence four letters authored by Ms. Raposa regarding the boys' well-being in their foster home and their adjustment to the new environment over time; respondent objected to the admission of the letters on the grounds that the requisite foundation had not been laid and that they constituted inadmissible hearsay, but the chief judge overruled respondent's objection and admitted the letters as a full exhibit. Furthermore, Ms. Raposa testified that A.M. initially wanted to return to his father but changed his mind over time as he acclimated to the foster home, but that N.M. never intended to return to his father from the outset of his placement. Ultimately, Ms. Raposa supported the adoption of

all three boys by Ms. Pettigrew and recommended to the court that DCYF pursue permanency.

After reviewing the testimony and evidence before him, the chief judge of the Family Court issued a written decision, finding by clear and convincing evidence that respondent abandoned N.M. in a shelter when he moved to South Carolina; failed to complete anger management treatment; caused the interruption to the visitation schedule through his own actions and inaction; did not make consistent improvements toward steady employment, housing, and other socioeconomic directives in his case plan; did not complete a substance-abuse assessment; and declined to participate in a psychiatric assessment at CCA to determine if medication would be appropriate. The chief judge also found that respondent's history of domestic abuse and serious mental health struggles played a significant role in DCYF's decision to keep the children in its custody. Finally, the chief judge concluded that the children thrived in the care of Ms. Pettigrew and that it would be in their best interests to terminate respondent's parental rights.

On March 7, 2022, the Family Court entered a decree terminating respondent's parental rights to N.M., A.M., and B.M. pursuant to § 15-7-7(a)(3). The respondent filed timely notices of appeal. This Court consolidated the parties' appeals on January 18, 2023.

**Standard of Review**

We review a Family Court justice's ruling to terminate parental rights by examining the record to ascertain whether legal and competent evidence supports her or his findings. *In re J.B.*, 291 A.3d 1253, 1257 (R.I. 2023). This Court affords the findings of the Family Court justice great weight and will not disturb them on appeal unless the findings are clearly wrong or the trial justice overlooked or misconceived material evidence. *Id.* The biological parent's right to due process requires that the state support its allegations by at least clear and convincing evidence. *Id.*

**Discussion**

Before this Court, respondent argues that the Family Court chief judge erred in finding (1) that DCYF proved respondent's unfitness by clear and convincing evidence; and (2) that DCYF proved by clear and convincing evidence that it made reasonable efforts to achieve reunification between respondent and his sons. Additionally, respondent argues that, because the best interests of the child can be determined only after a parent is found to be unfit, the chief judge necessarily erred in reaching the question of best interests.

We have held that parents possess an inherent liberty interest in the care, custody, and management of their children. *In re Isabella M.*, 66 A.3d 825, 830 (R.I. 2013). Before terminating an individual's parental rights, the trial justice must find

that the parent is unfit. *In re J.B.*, 291 A.3d at 1257. Once the unfitness is determined, "the best interests of the child outweigh all other considerations." *Id.* (quoting *In re Pricillion R.*, 971 A.2d 599, 604 (R.I. 2009)).

Section 15-7-7(a)(3) provides the following:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency, or by the birthmother or guardian of a child born under circumstances referenced in subsection (a)(2)(viii) of this section, after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

> "* * *

> "(3) The child has been placed in the legal custody or care of the department of children, youth and families for at least twelve (12) months, and the parents were offered or received services to correct the situation that led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

The Court is satisfied that there is competent evidence in the record that supports the chief judge's findings regarding respondent's unfitness, DCYF's reasonable efforts, and the best interests of the children. Specifically, our review of

- 13 -

the record indicates that N.M. came into the custody of DCYF on March 11, 2015, after N.M.'s school contacted the DCYF hotline to report physical abuse. DCYF's initial investigation raised serious concerns about N.M.'s placement with respondent and ultimately resulted in his removal from respondent's care. The record also indicates that DCYF removed A.M. on August 19, 2016, due to DCYF's allegations of neglect, and later removed B.M. two days after his birth on May 3, 2017. The evidence in the record demonstrates that, over the course of more than three years after N.M. came into its care, DCYF attempted to address its concerns regarding dependency, abuse, and neglect throughout the duration of these cases by developing several case plans and making referrals for services to correct the behavior that led to each child's removal. The evidence in the record also supports the chief judge's finding that respondent did not meaningfully address DCYF's concerns regarding his mental health and lifestyle challenges and further, that respondent inconsistently engaged with DCYF's required directives, including attending visitation with his sons.

After hearing testimony from the witnesses and reviewing the exhibits presented by the parties, the chief judge carefully outlined respondent's failure to engage with the requirements of his case plans. The chief judge found that respondent did not complete his counseling goals or gain the protective capacity required to show that he could safely parent his sons. Furthermore, the chief judge

gave great weight to Dr. Parsons's diagnostic impressions, recommendations, and prognosis, which indicated that respondent appeared to be in denial concerning his issues and limitations and that he underreported his symptoms of anxiety, depression, and mood instability. Most importantly, Dr. Parsons cautioned that respondent should adhere closely to his recommendations before having any chance at reunification. It is well settled that a parent's lack of interest in his children, exemplified by an unwillingness to cooperate with DCYF directives, serves as a sufficient basis for a finding of unfitness. *In re Gelvin B.*, 251 A.3d 503, 509 (R.I. 2021). DCYF presented competent evidence to support the chief judge's findings of unfitness, and this Court will not disturb those findings.

Nevertheless, respondent argues that DCYF's repeated disruption of his visitation schedule after it received unsubstantiated hotline calls and DCYF's failure to incorporate family counseling into his case plans contradict the chief judge's finding that it made reasonable efforts to achieve reunification. We disagree. Although DCYF must show by clear and convincing evidence that it offered services to correct respondent's shortcomings through reasonable efforts, the determination of reasonable efforts still takes into account a parent's conduct and cooperation with services. *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013).

The respondent is correct that DCYF caused disruptions to his visitation schedule before 2018; however, DCYF canceled visits due to safety concerns related

- 15 -

to three separate RI CHILD hotline calls indicating that respondent possessed weapons and intended to use them to regain custody of his sons. The calls came in anonymously, but DCYF took necessary precautions to keep the children out of harm's way. Further, while we do not condone DCYF's failure to provide visitation between September 2017 and January 2018, we must equally consider respondent's conduct and cooperation with the visitation schedule during the period when DCYF provided it. *In re R.M.*, 293 A.3d 1255, 1265 (R.I. 2023). The record indicates that respondent complied with the visitation schedule between November 2016 and June 2017 when visits occurred at NRIVC. However, respondent did not comply with the visitation schedule on a consistent basis after that time period, and he acknowledged that, while living in South Carolina, he could not recall when he first returned to Rhode Island for a visit with N.M., who was then eight years old. In July and August of 2018, respondent failed to attend four biweekly visits with N.M. and A.M. In fact, after June 2018, respondent attended only two in-person visits with A.M. and B.M., one of which was at the request of A.M. himself. Therefore, we are satisfied that the chief judge properly found that DCYF engaged in reasonable reunification efforts, especially in light of respondent's inconsistent cooperation with his visitation schedule, and that sufficient competent evidence supports those findings.

The respondent's argument regarding DCYF's failure to incorporate family counseling into the case plans is also without merit. Although Ms. Raposa testified that she recommended family counseling to DCYF, the record does not reveal any evidence regarding the timing of that recommendation; the timing is material because N.M. and A.M.'s willingness to reunite with respondent deteriorated over time.[8] Moreover, Ms. Raposa also testified that she did not make a referral for family counseling. Based on the foregoing, we conclude that DCYF demonstrated reasonable efforts to reunify the family.

Once DCYF establishes that a respondent is unfit and that it made reasonable efforts toward reunification, the children's best interests outweigh all other considerations. *In re Donnell R-H Jr.*, 275 A.3d 1139, 1144 (R.I. 2022). This Court recognizes that respondent undoubtedly loves his children. We also credit respondent's initial attempts to address the directives in the case plans, especially in light of his own pervasive and longstanding mental health and socioeconomic

---

[8] The respondent also points to CCA's progress and drug screen records in support of his argument that CCA recommended family counseling. After reviewing the record, it appears that Mr. Cruz indicated in his post-supervised visit progress note from June 20, 2017, that "[f]amily therapy would be highly beneficial" and that his plan was to speak to DCYF regarding family therapy. Of paramount importance is the date of Mr. Cruz's note: in the same way that timing is important for Ms. Raposa's recommendation, so it is for Mr. Cruz's. Following the three hotline calls to RI CHILD, Mr. Cruz ceased supervising visitation and the record is not clear as to whether Mr. Cruz ever communicated his impressions regarding the benefits of family therapy to DCYF.

- 17 -

struggles. Nevertheless, once unfitness is established, the primary focus shifts from the parent to the child's best interests. *Id*. Our review of the record indicates that sufficient competent evidence supports the chief judge's findings regarding the children's best interests. Specifically, the chief judge found that the boys thrived for more than four years in the nurturing and supportive presence of their foster mother. Furthermore, we have unequivocally held that a child deserves permanency. *Id*. at 1146. Based on the stability and long-term nature of N.M., A.M., and B.M.'s placement with Ms. Pettigrew, this Court concludes that termination of respondent's parental rights is in the children's best interests.

The respondent nevertheless appears to argue that the chief judge's alleged error in admitting as evidence the four letters authored by Ms. Raposa "significantly undercuts the trial justice's finding about what is best for [the] children." We disagree. Even if the chief judge erred in admitting the letters, his written decision demonstrates that he equally relied on N.M. and A.M.'s *in camera* interviews and testimony from DCYF caseworkers who observed the children in their pre-adoptive foster home to make findings regarding best interests; therefore, the letters served as cumulative evidence and their admission constitutes harmless error.

For the reasons set forth in this opinion, we conclude that the chief judge did not err in finding that DCYF proved, by clear and convincing evidence, the

respondent's unfitness, its reasonable efforts toward reunification, and that termination of the respondent's parental rights served the children's best interests.

## Conclusion

Based on the foregoing, we affirm the decree appealed from and remand the record in this matter to the Family Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re B.M.<br>In re A.M.<br>In re N.M. |
| **Case Number** | No. 2022-142-Appeal. (P 18-4948)<br>No. 2022-143-Appeal. (P 18-1856)<br>No. 2022-144-Appeal. (P 18-1855) |
| **Date Opinion Filed** | August 28, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Chief Judge Michael B. Forte |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth and Families<br><br>Andrew J. Johnson<br>Court Appointed Special Advocate |
| | For Respondent:<br><br>Michael Graham Ewart<br>Rhode Island Public Defender |